# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

MINNEAPOLIS FIREFIGHTERS' RELIEF
ASSOCIATION, individually and on behalf of
itself and all others similarly situated,

     *Plaintiffs,*

v.

MEDTRONIC, INC.; WILLIAM A.
HAWKINS, III; and GARY ELLISS,

     *Defendants.*

Case No.
0:08-cv-06324-PAM-AJB

---

## MEMORANDUM OF LAW IN SUPPORT OF THE INSTITUTIONAL INVESTOR GROUP'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFFS AND FOR APPROVAL OF THEIR SELECTION OF COUNSEL

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Geoffrey C. Jarvis
485 Lexington Avenue, 29th Fl.
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

MOTLEY RICE LLC
Joseph F. Rice
Ann K. Ritter
P. O. Box 1792 (29465)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450

*LIAISON COUNSEL*:
GUSTAFSON GLUEK PLLC
Daniel E. Gustafson (No. 202241)
Daniel C. Hedlund (No. 0258337)
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

February 9, 2009

*Counsel for The Institutional Investor Group*
*and Proposed Lead and Liaison Counsel for the Class*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................... i

PRELIMINARY STATEMENT ...................................................... 1

STATEMENT OF FACTS ............................................................ 3

The Institutional Investor Group ................................................ 3

Background Regarding Medtronic's Wrongdoing ............................. 5

ARGUMENT ........................................................................ 10

I.    THE INSTITUTIONAL INVESTOR GROUP SHOULD BE APPOINTED
    LEAD PLAINTIFF IN THE RELATED ACTIONS ......................... 10

    A.    The PSLRA Favors Institutional Investors Who Have A Large Financial
    Interest In The Lawsuit ............................................... 11

    B.    The Institutional Investor Group Has The Largest Financial Loss Of The
    Plaintiffs Who Have Come Forward In This Case ..................... 13

    C.    The Institutional Investor Group Satisfies The Requirements Of
    Rule 23 ................................................................. 14

        1.    The Institutional Investor Group's Claims Are Typical Of The
        Class's Claims ................................................. 15

        2.    The Institutional Investor Group Will Adequately Represent The
        Interests Of The Class ........................................ 17

        3.    The Presence of A Foreign Investor Does Not Impact The
        Institutional Investor Group's Adequacy to Serve As Lead
        Plaintiff ....................................................... 18

    D.    The Court Should Approve the Institutional Investor Group's Choice of
    Counsel ................................................................ 20

CONCLUSION ...................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*In re Able Labs. Sec. Litig.*,
    No. 05-2681 (JAG) (D.N.J. Mar. 17, 2006) .................................................................... 18

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) ............................................................................ 11

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, 2003 WL
    102806 (S.D.N.Y. Jan. 10, 2003) ................................................................................ 14

*Averdick v. Hutchinson Tech., Inc.*,
    No. 05-2095-MJD-SRN, 2006 U.S. Dist. LEXIS 47445
    (D. Minn. Feb. 9, 2006) ......................................................................................... 10, 14

*In re Beazer Homes USA, Inc. Sec. Litig.*,
    Case No. 1:07-cv-00725-CC (N.D.Ga.) ......................................................................... 4

*In re Cavanaugh*,
    306 F.3d 726 (9th Cir. 2002) ...................................................................................... 20

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) .................................................................................. 10, 14

*In re Conagra Foods, Inc. Sec. Litig.*,
    No. 8:05-cv-00292-LES-TDT (D. Neb. Dec. 2, 2005).................................................. 19

*Conway Inv. Club v. Corinthian Colls., Inc.*,
    No. 2:04-cv-05025 (C.D. Cal. Nov. 1, 2004) ............................................................... 19

*Cox v. Delphi Corp.*,
    No. 1:05-CV-2637(NRB) (S.D.N.Y. June 27, 2005) .................................................... 19

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ................................................................................. 16

*Curtis v. BEA Sys., Inc.*,
    No. C04-2275 SI (N.D. Cal. Sept. 24, 2004)............................................................... 19

*In re Darden Restaurants, Inc. Sec. Litig.*,
    Case No. 6:08-cv-00388-MSS-DAB (M.D.Fla.)............................................................. 4

*In re Dell Inc., Sec. Litig.*,
    No. A-06-CA-726-SS (W.D. Tex. Apr. 9, 2007) ....................................................... 18

*In re Dreamworks Animation SKG, Inc., Sec. Litig.*,
    No. CV 05-03966 (C.D. Cal. Nov. 7, 2005) ............................................................... 19

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) ...................................................................................... 15

*In re General Motors Corp. Sec. Litig.*,
    No. 05-CV-8088 (RMB) (S.D.N.Y. Feb. 6, 2006) ..................................................... 19

*Gesenhues v. Checchi*,
    No. 05-CIV-10653 (RJH), 2006 WL 1169673 (S.D.N.Y. May 3, 2006) .................... 10

*Glauser v. EVCI Ctr. Colls. Holding Corp.*,
    236 F.R.D. 184 (S.D.N.Y. 2006) ............................................................................... 12

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
    No. 5:03 CV 2166, 2004 WL 3314943 (N.D. Ohio, May 12, 2004) ........................... 19

*Hicks v. Morgan Stanley & Co.*,
    No. 01-CIV-10071 (HB), 2003 WL 21672085 (S.D.N.Y. July 16, 2003) .................. 15

*Kadagian v. Harley-Davidson, Inc.*,
    No. 05-C-0547 (E.D. Wis. Feb. 14, 2006) ................................................................. 18

*Keller v. First Marblehead Corp.*,
    No. 08-10612-JLT (D. Mass. Aug. 28, 2008) ............................................................ 18

*Kops v. NVE Corp.*,
    2006 U.S. Dist. LEXIS 49713 (D. Minn. July 17, 2006) ........................................... 11

*In re Lucent Techs., Inc., Sec. Litig.*,
    194 F.R.D. 137 (D.N.J. 2000) .................................................................................... 17

*Marsden v. Select Med. Corp.*,
    No. 04-4020 (E.D. Pa. Order entered Oct. 5, 2006) ................................................... 21

*Mass. Laborers' Annuity Fund v. Encysive Pharm. Inc.*,
    No. H-06-3022 (S.D. Tex. Mar. 20, 2007) ................................................................. 18

*Mirco Investors, LLC v. Inspire Pharm., Inc.*,
    No. 1:05CV00118 (M.D.N.C. Mar. 1, 2006) ............................................................. 18

*In re Molson Coors Brewing Co. Sec. Litig.,*
    233 F.R.D. 147 (D. Del. 2005)...........................................................................18

*In re Nice Sys. Sec. Litig.,*
    188 F.R.D. 206 (D.N.J. 1999)........................................................................... 17

*In re Nortel Networks Corp. Sec. Litig.,*
    No. 01 Civ. 1855 (S.D.N.Y. Sept 5, 2003) ................................................... 19

*In re NPS Pharm., Inc. Sec. Litig.,*
    No. 2:06-cv-00570-PGG-PMW (D. Utah Nov. 17, 2006) ..............................18

*Olsen v. New York Cmty. Bancorp, Inc.,*
    No. 04-CV-4165 (E.D.N.Y. Aug. 9, 2005) .................................................... 19

*In re Olsten Corp. Sec. Litig.,*
    181 F.R.D. 218 (E.D.N.Y. 1998)................................................................... 12

*In re Party City Sec. Litig.,*
    189 F.R.D. 91 (D.N.J. 1999)............................................................... 13, 15, 17

*Reimer v. Ambac Fin. Group, Inc.,*
    2008 U.S. Dist. LEXIS 38729 (S.D.N.Y. May 9, 2008) ............................. 12

*In re Shuffle Master, Inc. Sec. Litig.,*
    Case No. 2:07-cv-00715-KJD-RJJ (D.Nev) ................................................... 4

*In re Sipex Corp. Sec. Litig.,*
    No. C 05-00392 WHA (N.D. Cal. May 24, 2005) ....................................... 19

*Skwortz v. Crayfish Co., Ltd.,*
    No. 00-6766 (DAB), 2001 WL 1160745 (S.D.N.Y. Sept. 28, 2001) .......................... 13

*In re Smith & Wesson Holding Corp. Sec. Litig.,*
    07-cv-30238 (D.Mass.) .................................................................................. 4

*South Ferry LP #2 v. Killinger,*
    No. CV04-1599 JCC (W.D. Wash. Nov. 30, 2004) ..................................... 19

*In re Sunrise Senior Living, Inc. Sec. Litig.,*
    Case No. 1:07-cv-00102-RBW .................................................................... 4

*In re Universal Access, Inc. Sec. Litig.,*
    209 F.R.D. 379 (E.D. Tex. 2002) ................................................................ 15

*Welmon v. Chicago Bridge & Iron Co. N.V.*,
    No. 06-CV-01283 (JES) (S.D.N.Y. May 11, 2006) ................................................... 18

*In re Williams Sec. Litig.*,
    No. 02-CV-0072-H(M) (N.D. Okla. July 8, 2002)...................................................... 19

*Zemel Family Trust v. Philips Int'l Realty Corp.*,
    205 F.R.D. 434 (S.D.N.Y. 2002) ............................................................................... 12

### STATUTES

15 U.S.C. § 78u ................................................................................................. 11, 12, 14

### OTHER AUTHORITIES

1 H. Newberg, *Newberg on Class Actions* § 3.13 (4th ed. 2007) ...................................... 16

Alex Nussbaum, "Medtronic Dives on Missed Estimates, Slumping Sales," ................... 6

David Armstrong and Thomas M. Burton, "Medtronic Product Linked to Surgery
    Problems," *Wall Street Journal*, September 4, 2008 ...................................................... 8

Rule 23of the Federal Rules of Civil Procedure ........................................................ passim

Conference Report on Securities Litigation Reform, H.R. REP. NO. 104-369,
    (1995), 1995 WL 709276; S. REP. NO. 104-98 (1995), 1995 WL 372783H.R.
    REP. NO. 104-369 (1995).............................................................................................. 2

## PRELIMINARY STATEMENT

Union Asset Management Holding AG ("Union"), Carpenters Pension Trust Fund for Northern California ("CPTF"), Carpenters Annuity Trust Fund for Northern California ("CATF"), and Oklahoma Firefighters Pension Fund ("OFPF"), (collectively referred to herein as the "Institutional Investor Group"), in connection with the securities fraud class action lawsuit filed against Medtronic, Inc. ("Medtronic" or the "Company"), William A. Hawkins, III ("Hawkins"), and Gary Elliss ("Elliss") (collectively, "Defendants") hereby move to be appointed as Lead Plaintiffs pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by Section 101(a) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The Institutional Investor Group further moves for approval of its selection of the law firms of Grant & Eisenhofer P.A. ("Grant & Eisenhofer") and Motley Rice LLC ("Motley Rice"), as Lead Counsel, and Gustafson Gluek PLLC ("Gustafson Gluek") as Liaison Counsel.

The relief sought by the Institutional Investor Group is precisely what the framers of the PSLRA hoped to accomplish by enacting the PSLRA's lead plaintiff provision – to have complex class actions arising under the federal securities laws controlled by institutional investors that are represented by experienced and accomplished counsel. As Congress noted in the Statement of Managers, the PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs" because, among other reasons, institutional investors and other class members with large amounts at stake "will represent the interests of the plaintiff class more effectively than class members with

small amounts at stake." Conference Report on Securities Litigation Reform, H.R. REP. No. 104-369, at 34 (1995), 1995 WL 709276; S. REP. No. 104-98 (1995), 1995 WL 372783. The Institutional Investor Group, with aggregate assets exceeding $174 billion, is composed of exactly the type of large institutional investors envisioned by Congress as the most adequate lead plaintiffs in securities class action suits.

As detailed in the certifications submitted herewith, between November 19, 2007 and November 17, 2008 (the "Class Period") the Institutional Investor Group, combined, purchased 835,437 shares of Medtronic stock. The Institutional Investor Group suffered approximately $13,136,837 in losses in connection with its transactions.[1]    *See* Certifications filed on behalf of each member of the Institutional Investor Group ("Institutional Investor Group Certifications"), attached to the Declaration of Geoffrey Jarvis In Support Of The Institutional Investor Group's Motion For Appointment As Lead Plaintiff And For Approval Of Its Selection Of Counsel ("Jarvis Decl.") at Exs. A-D submitted herewith.    In addition to evidencing the Institutional Investor Group's

---

[1]    The breakdown of the Institutional Investors Group's holdings and purchases, as evidenced in the Certifications, is as follows: Union – 694,969 (Class Period purchases); CPTF – 20,228 (Pre-Class Period holdings), 63,059 (Class Period purchases); CATF – 9,879 (Pre-Class Period holdings),  30,209 (Class Period purchases); and, OFPF– 9,400 (Pre-Class Period holdings), 47,200 (Class Period purchases). *See* Jarvis Decl., at Exs. A-D. All of the members of the Institutional Investor Group were net purchasers during the Class Period.   The breakdown of the Institutional Investor Group's losses is as follows: Union (approximately $11.125 million); CPTF (approximately $682,045); CATF (approximately $323,015); and, OFPF (approximately $1,005,901).  Losses were determined by using a 90-day look back period at a price of $ $31.7241 per share – Medtronic's closing price on February 9, 2009. In determining losses under the PSLRA, the Institutional Investor Group has used the class period of  November 19, 2007 to November 17, 2008, inclusive, as alleged in *Minneapolis Firefighters' Relief Association* Complaint (Case No. 0:08-cv-06324-PAM-AJB), the first (and only) filed case.

significant stake in the outcome of this litigation, the Institutional Investor Group Certifications demonstrate each group member's desire to serve as lead plaintiff in this action, as well as its understanding of the attendant duties and obligations of serving in that role. *See id.*

The Institutional Investor Group believes that its financial interest in this action is the largest of any class member seeking appointment as lead plaintiff in this action. The Institutional Investor Group is not aware of any other class member that has filed an action or filed an application for appointment as lead plaintiff that suffered greater losses due to Defendants' fraud. In addition, the Institutional Investor Group satisfies each of the applicable requirements of the PSLRA and Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and, therefore, is qualified for appointment as lead plaintiff in this action. Thus, pursuant to the PSLRA's lead plaintiff provision, the Institutional Investor Group is presumptively the most adequate plaintiff and should be appointed Lead Plaintiff for the class. Additionally, the Court should approve the Institutional Investor Group's selection of Grant & Eisenhofer and Motley Rice as Lead Counsel and Gustafson Gluek as Liaison Counsel.

## STATEMENT OF FACTS

### The Institutional Investor Group

Each member of the Institutional Investor Group is a large, well-established institutional investor. Union Asset Management Holding AG (Union) is based in Frankfurt am Main, Germany and is the holding organization of the Union Investment Group with offices in Germany, Switzerland, Luxembourg, Poland, Italy, and Spain.

Union ranks among the three leading German fund managers by market share, with fifty years of experience and 1,900 employees. Unions's assets under management are over $170 billion. OFPF was created by the Oklahoma legislature in 1981, and currently manages assets in excess of $1.75 billion for its over 21,700 participating members. CPTF is a defined benefit pension plan established in June of 1957, and currently manages assets of approximately $1.9 billion for its over 55,000 participating members. CATF is a defined contribution plan established in August of 1981, and currently manages assets in excess of $1.7 billion for its over 55,000 participating members. Combined, the Institutional Investor Group lost over $13,136,837 as a result of holding and purchasing Medtronic's securities at artificially inflated prices during the Class Period.

The Institutional Investor Group, moreover, is composed of members who have experience serving as lead plaintiffs in securities class actions. Indeed, during the past three years, CATF and CPTF were appointed as lead plaintiffs in *In re Darden Restaurants, Inc. Securities Litigation*, Case No. 6:08-cv-00388-MSS-DAB (M.D.Fla.); CPTF was appointed as a lead plaintiff in *In re Beazer Homes USA, Inc. Securities Litigation*, Case No. 1:07-cv-00725-CC (N.D.Ga.); and OFPF was appointed as a lead plaintiff in *In re Sunrise Senior Living, Inc. Securities Litigation*, Case No. 1:07-cv-00102-RBW (D-DC), *In re Shuffle Master, Inc. Securities Litigation*, Case No. 2:07-cv-00715-KJD-RJJ (D.Nev), and *In re Smith & Wesson Holding Corp. Securities Litigation*, 07-cv-30238 (D.Mass.). In the past three years, Union has served (and presently serves) as a lead plaintiff for a class in an action under the federal securities laws in both *In Re*

4

*Dell, Inc. Securities Litigation*, No. 06-CV-00726 (W.D. Tex. 2006) and *In Re UBS AG Securities Litigation*, No. 07-CV-11225 (S.D.N.Y. 2008). *See* Jarvis Decl. at Exs. A-D, respectively.

## Background Regarding Medtronic's Wrongdoing

Medtronic develops, manufactures and markets medical devices worldwide. In its most recent 10-K, Medtronic describes itself as "the global leader in medical technology — alleviating pain, restoring health, and extending life for millions of people around the world."[2] Founded in 1949, Medtronic is headquartered in Minneapolis, Minnesota and operates in 120 countries through more than 38,000 employees.[3] The company's stock is traded on the New York Stock Exchange under the symbol MDT.

Medtronic currently functions in seven operating segments that manufacture and sell device-based medical therapies: Cardiac Rhythm Disease Management ("CRDM"), Spinal, CardioVascular, Neuromodulation, Diabetes, Surgical Technologies and Physio-Control.[4] Historically, the CRDM segment, which manufactures pacemakers, implantable defibrillators, leads, insertable cardiac monitors and other related devices for cardiac rhythm disease management, has been Medtronic's core business. However, sales of Medtronic's CRDM products have slowed as a result of industry-wide recalls of certain

---

[2] *See* Form 10-K for year ended April 25, 2008, at 1, available at http://idea.sec.gov/Archives/edgar/data/64670/000089710108001392/medtronic082604s1_10k.htm#toc2.

[3] *See* 2008 Annual Report, available at http://www.medtronic.com/wcm/groups/mdtcom_sg/@mdt/documents/documents/2008-annual-report.pdf.

[4] *See* Form 10-K for year ended April 25, 2008, at 2.

implantable defibrillators in 2005, Medtronic's voluntary suspension of distribution of certain defibrillator leads in 2007, and a plethora of products liability actions in connection with those two events. In addition, Medtronic has faced increasing pressure from its main competitor, Boston Scientific.[5] Consequently, net sales of CRDM products as a percentage of total sales have declined from 43% for fiscal year 2006 to 37% for fiscal year 2008.[6]

As sales in its core segment have stagnated, Medtronic was purporting to show great promise in other areas, particularly in its Spinal segment. Medtronic claims that it "is the global leader in today's spine market," and that it "collaborates with world-renowned surgeons, researchers and innovative partners to offer state-of-the-art products and technologies."[7] Net sales in the Spinal segment, as a percentage of total sales, have increased from 19% for fiscal year 2006 to 22% for fiscal year 2008.[8] This increase has been due in part to double-digit growth in sales of INFUSE, a bio-engineered protein that stimulates bone growth. In the Form 10-Q for the period ended July 25, 2008, Medtronic reported that "Spinal Biologics net sales for the three months ended July 25, 2008 were

---

[5] *See* Alex Nussbaum, "Medtronic Dives on Missed Estimates, Slumping Sales," dated November 18, 2008, available at http://www.bloomberg.com.

[6] *See* Form 10-K for year ended April 25, 2008, at 3.

[7] *See* News Release, dated September 26, 2008, available at http://www.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1222446047995.

[8] *See* Form 10-K for year ended April 25, 2008, at 7-9.

$221 million, an increase of 16 percent over the same period of the prior fiscal year. This increase was primarily driven by continued strong acceptance of Bone Graft in the U.S."[9]

Throughout the Class Period, the Company repeatedly touted the commercial viability of INFUSE as a driving force in increasing the Company's profitability. For example, in November 2007, at the start of the Class Period, Medtronic announced that the Spinal segment generated $660 million in revenue, an increase of 10% for the quarter, "driven by sales of the biologics product line and strong growth outside the U.S."[10] In December 2007 and February 2008, Medtronic announced continued increases in revenue in the Spinal segment, "with strong double digit performance in worldwide Biologics, and strong growth in Core Spinal outside the U.S."[11] In an analyst conference call, CEO Hawkins went on to note that this "solid growth ... helped to partially offset competitive pressures on our core spinal products in the U.S."[12] In March 2008, Medtronic once again reported double-digit increases in net sales for Spinal Biologics, "primarily driven

---

[9] *See* Form 10-Q for the period ended July 25, 2008, p. 33, available at http://idea.sec.gov/Archives/edgar/data/64670/000089710108001858/medtronic083633_10q.htm.

[10] *See* Exhibit 99.1 to Form 8-K, filed November 19, 2007, available at http://idea.sec.gov/Archives/edgar/data/64670/000095013707017477/c21687exv99w1.htm.

[11] *See* Exhibit 99.1 to Form 8-K, filed February 19, 2008, available at http://idea.sec.gov/Archives/edgar/data/64670/000095013408002985/c23933exv99w1.htm.

[12] The transcript of the analyst call is no longer available on Medtronic's website, but it is cited in the first filed complaint by the *Minneapolis Firefighters' Relief Association* (Case No. 0:08-cv-06324-PAM-AJB  ) (hereafter, the "Complaint") at ¶ 26.

by continued strong acceptance of INFUSE Bone Graft in the U.S."[13]  In April through August 2008, Medtronic made additional positive statements and issued more positive reports on INFUSE, again portraying the product as a solid and reliable source of revenue for Medtronic.

On September 4, 2008, the *Wall Street Journal* published a front-page article entitled, "Medtronic Product Linked to Surgery Problems," which discussed increasing reports of complications associated with off-label use of INFUSE, as well as Medtronic's financial ties to spinal doctors promoting such use.[14]  Medtronic issued a press release on September 25, 2008 responding to allegations concerning inappropriate financial relationships and stated that "Medtronic's policies prohibit inducements, including providing benefits to customers with an explicit or implicit requirement to use or purchase Medtronic products."[15]

Irrespective of the negative press, on September 26, 2008, Medtronic announced that INFUSE was honored with the Prix Galien USA 2008 Award for Best Biotechnology

---

[13] *See* Form 10-K for the quarter ended January 25, 2008, filed March 4, 2008, available at http://idea.sec.gov/Archives/edgar/data/64670/000089710108000478/0000897101-08-000478-index.idea.htm.

[14] *See* Complaint ¶ 41; *see also* David Armstrong and Thomas M. Burton, "Medtronic Product Linked to Surgery Problems," *Wall Street Journal*, September 4, 2008, available at http://online.wsj.com/article/SB122047307457096289.html.

[15] *See* News Release, dated September 25, 2008, available at http://www.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1222324225628&lang=en_US.

Product.[16]    The Vice President of Biologics Research and Development proudly proclaimed, "This technology [i.e., INFUSE] presents breakthrough biological therapeutic capabilities which have had a dramatic impact on patient care and is redefining the standard of care for bone regenerative surgery."

Despite its perpetually rosy outlook on INFUSE to the bitter end, in November 2008, Medtronic shocked analysts when it released an earnings report for the second quarter, ended October 24, 2008, which fell well short of analysts' estimates. The 14% decline in net income was due in significant part to the fact that sales in the Spinal segment fell short of projections, recording sales of $829 million, which was far below analysts' estimates of $898 million. In contrast to the double-digit increases seen in the past year, revenue in the Spinal segment grew by only 3%. Medtronic attributed the sharp decline to "negative stories in the press," as well as a formal investigation launched by the Department of Justice into Medtronic's marketing of INFUSE.

The November 2008 revelations alerted investors that Medtronic had been deceiving the investing public for more than a year by misrepresenting and concealing known problems with its INFUSE franchise. Among other things, Defendants' statements concerning INFUSE were materially false and misleading to investors because defendants knew but failed to disclose the extent to which INFUSE revenues were dependent on non-FDA approved, off-label applications of the product which were

---

[16] *See* News Release, dated September 26, 2008, available at
http://www.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1222446047995
&lang=en_US.

increasingly causing severe medical complications. These problems (among others), if disclosed, would have significantly jeopardized the commercial viability of the INFUSE. The market's reaction was appropriately severe: Medtronic stock plummeted $4.82 or 13% to $31.60 – its biggest drop since February 1984 – on unusually heavy trading. The sharp decline resulted in investors losing billions.

The *Minneapolis Firefighters' Relief Association* plaintiff published a notice in *MarketWire*, on December 10, 2008, apprising all prospective class members of the pendency of the lawsuit and the nature of the allegations, their right to seek appointment as lead plaintiff within sixty days of the publication of the notice (February 9, 2008), and the purported class period. Jarvis Decl. at Ex. J. The Institutional Investor Group brings this motion pursuant to this notice.

## ARGUMENT

### I.   THE INSTITUTIONAL INVESTOR GROUP SHOULD BE APPOINTED LEAD PLAINTIFF IN THE RELATED ACTIONS

In determining which movants to appoint as lead plaintiff, the Court must consider two factors: (1) which movant(s) have the largest financial interest in the litigation; and (2) do those movants meet the typicality and adequacy requirements of Rule 23? *See In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001);[17] *Gesenhues v. Checchi*, No. 05-CIV-10653 (RJH), 2006 WL 1169673, at *2 (S.D.N.Y. May 3, 2006) ("The PSLRA

---

[17] Courts in this District have appropriately recognized that authorities from outside the Eighth Circuit carry significant persuasive weight since "the Eighth Circuit Court of Appeals has had little opportunity to pass on the lead counsel provisions of the PSLRA." *See Averdick v. Hutchinson Tech., Inc.*, No. 05-2095-MJD-SRN, 2006 U.S. Dist. LEXIS 47445, at *5 (D. Minn. Feb. 9, 2006)

... provides that the most adequate plaintiff has (1) 'the largest financial interest' in the relief sought by the class and (2) satisfies the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure"). Here, the Institutional Investor Group is composed of exactly the type of large institutional investors envisioned by Congress as the most adequate lead plaintiff in a securities class action lawsuit. Further, the Institutional Investor Group has timely filed this motion in accordance with the statutory requirements and has the resources, expertise, and willingness to be fully involved in this litigation and to obtain the maximum possible compensation for class members. Accordingly, the Institutional Investor Group should be appointed as Lead Plaintiff and its selection of Lead and Liaison Counsel should be approved.

### A.    The PSLRA Favors Institutional Investors Who Have A Large Financial Interest In The Lawsuit

The PSLRA provides that any member of a purported class may move to be appointed lead plaintiff within 60 days of the publication of notice announcing the action. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). The Institutional Investor Group has done so here. *See* Jarvis Decl. at Ex. J (Notice of the first filed complaint). Once such class members have so moved, the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." 15 U.S.C. § 78u-4(a)(3)(B)(i); *Kops v. NVE Corp.*, 2006 U.S. Dist. LEXIS 49713, at *8 (D. Minn. July 17, 2006).[18] Consistent

---

[18] Courts have regularly interpreted the language of the 15 U.S.C. § 78u-4(a)(3)(B)(i) as permitting *a group* of investors to collectively move and serve as lead plaintiff under the PSLRA. *See, e.g.*, *Kops*, 2006 U.S. Dist. LEXIS 49713, at *8; *In re Am. Bank Note*

with its legislative history, the PSLRA provides that the court shall make a significant

presumption when determining the "most capable" plaintiff:

> [T]he court shall adopt a presumption that the most adequate plaintiff in
> any private action arising under this chapter is the person or group of
> persons that –
>
>> (aa) has either filed the complaint or made a
>> motion in response to a notice under
>> subparagraph (A)(i);
>>
>> (bb) in the determination of the court, has the
>> largest financial interest in the relief sought by
>> the class; and
>>
>> (cc) otherwise satisfies the requirements of Rule
>> 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii). This presumption may be overcome only by proof that

the presumed lead plaintiff(s) will not fairly and adequately represent the class or is

subject to unique defenses. *Id.* Courts construing this provision have held that

institutional investors are presumptively the most adequate lead plaintiffs. *See, e.g.,*

*Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184 (S.D.N.Y. 2006)

(institutional investor's presumption of being the most adequate was not rebutted by other

movants); *Zemel Family Trust v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 437

(S.D.N.Y. 2002) (discussing Congressional intent while denying lead plaintiff status to

non-institutional investor plaintiff); *In re Olsten Corp. Sec. Litig.*, 181 F.R.D. 218, 220-

---

*Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 436 (S.D.N.Y. 2000) ("The
nomination of a group of investors as co-lead plaintiffs is specifically contemplated by
the PSLRA."); *see also Reimer v. Ambac Fin. Group, Inc.*, 2008 U.S. Dist. LEXIS 38729,
at *2 (S.D.N.Y. May 9, 2008) (allowing groups of investors to aggregate their losses
when moving for lead plaintiff is the majority view) (collecting authorities).

21 (E.D.N.Y. 1998) ("By establishing the presumptive criterion that the most adequate plaintiff is the one who 'has the largest financial interest in the relief sought by the class,' PSLRA §21D(a)(3)(B)(iii)(bb), Congress intended 'to increase the likelihood that institutional investors will serve as lead plaintiffs. . . .'").

The PSLRA's lead plaintiff provision also serves to "ensure[ ] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *In re Party City Sec. Litig.*, 189 F.R.D. 91, 104 (D.N.J. 1999) (citing *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y. 1997)); *Skwortz v. Crayfish Co., Ltd.*, No. 00-6766 (DAB), 2001 WL 1160745, at *2 (S.D.N.Y. Sept. 28, 2001) ("Congress believed that [the purpose behind the PSLRA] could best be achieved by encouraging institutional investors to serve as lead plaintiffs."). As set forth herein, the Institutional Investor Group is exactly the type of large institutional investor envisioned by the Congress in enacting the PSLRA, as it satisfies all of the criteria contemplated by the PSLRA for determining the most adequate lead plaintiff. Each member of the Institutional Investor Group is a large, well-respected financial institution that manages billions of dollars and each suffered substantial losses due to the fraud alleged in this action. As such, the Institutional Investor Group should be appointed as Lead Plaintiff in this action.

**B.    The Institutional Investor Group Has The Largest Financial Loss Of The Plaintiffs Who Have Come Forward In This Case**

The Institutional Investor Group believes that it has a greater financial interest in this action than any other class member who has come forward by virtue of its

approximate losses of over $13 million. *See In re Cendant*, 264 F.3d at 262; *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, 2003 WL 102806, at *2 (S.D.N.Y. Jan. 10, 2003) (appointing as lead plaintiff the institutional investor with the "largest financial stake in the litigation.").

The PSLRA does not mandate a particular method for calculating financial interest. Here, the Institutional Investor Group purchased over 835,000 shares of Medtronic stock during the Class Period. *See* Jarvis Decl. at Exs. A-D. The total loss suffered by the Institutional Investor Group is over $13 million. *See supra* at p. 2. The Institutional Investor Group does not believe other movants have a larger financial interest in this litigation.

## C.    The Institutional Investor Group Satisfies The Requirements Of Rule 23

Section 21D(a)(3)(B)(iii)(cc) of the PSLRA further provides that the Lead Plaintiff must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(cc). Rule 23(a) provides that a party may serve as a class representative so long as the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Of the four prerequisites of class certification under Rule 23(a), only two – typicality and adequacy of representation – directly address the characteristics of the lead plaintiff under the PSLRA which must be satisfied. *See Averdick*, 2006 U.S.

Dist. LEXIS 47445, at **9-10 (citing a string of out-of-circuit and District of Minnesota cases that have adopted this proposition). The remaining requirements of Rule 23 relate to the adequacy of the claims themselves and should not enter into the Court's analysis in its determination of who should serve as lead plaintiffs. Rather, the Court should defer examination of the remaining requirements until the lead plaintiffs move for class certification. *See In re Universal Access, Inc. Sec. Litig.*, 209 F.R.D. 379, 385 (E.D. Tex. 2002) (stating that the Court should defer examination of the remaining requirements until the lead plaintiff moves for class certification). The Institutional Investor Group meet both applicable requirements.

### 1.    The Institutional Investor Group's Claims Are Typical Of The Class's Claims

Rule 23(a)(3) of the Federal Rules of Civil Procedure requires that "the claims . . . of the representative parties" be "typical of the claims . . . of the class." A proposed lead plaintiff's claims are typical of the claims of the class when the proposed lead plaintiff's claims and injuries arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised on the same legal theory. *In re Party City Sec. Litig.*, 189 F.R.D. at 107 n. 13; *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) (typicality "permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment"); *Hicks v. Morgan Stanley & Co.*, No. 01-CIV-10071 (HB), 2003 WL 21672085, at *2 (S.D.N.Y. July 16, 2003) ("The typicality requirement is met when the class representative's claim 'arises from the same event or course of conduct that gives rise to

claims of other class members and the claims are based on the same legal theory.'")
(citations omitted); *see also* 1 H. Newberg, *Newberg on Class Actions* § 3.13 (4th ed.
2007) ("When it is alleged that the same unlawful conduct was directed at or affected
both the named plaintiff and the class sought to be represented, the typicality requirement
is usually met regardless of minor variations in fact patterns underlying individual
claims."). The Rule 23(a)(3) typicality requirement "is to ensure that 'maintenance of a
class action is economical and that the named plaintiff's claims and the class claims are
so interrelated that the interests of the class members will be fairly and adequately
protected in their absence.'" *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y.
2001) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Here, the Institutional Investor Group's claims arise from the same course of
conduct from which the claims of all other class members arise. Like other class
members, the Institutional Investor Group purchased shares of Medtronic and suffered
losses because of Defendants' fraudulent conduct. Like other class members, the
Institutional Investor Group invested in Medtronic securities blind to the fact that
Medtronic was inflating the value of its stock by making material misrepresentations and
omissions regarding the success of a product that was critical to its growth and
profitability. Accordingly, the claims of the Institutional Investor Group are in all
respects "typical" of the claims of other class members.

## 2. The Institutional Investor Group Will Adequately Represent The Interests Of The Class

Rule 23(a)(4)'s requirement of "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." *In re Nice Sys. Sec. Litig.*, 188 F.R.D. 206, 219 (D.N.J. 1999); *In re Lucent Techs., Inc., Sec. Litig.*, 194 F.R.D. 137, 151 (D.N.J. 2000). The adequacy of representation inquiry 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *In re Party City*, 189 F.R.D. at 108 (D.N.J. 1999) (quoting *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). The Institutional Investor Group easily meets the adequacy requirements.

Here, the Institutional Investor Group's interests are the same as those of other class members. Like other class members, the Institutional Investor Group seeks to hold the Defendants liable for the consequences of their violations of the federal securities laws. There are no facts which indicate any conflicts of interest between the Institutional Investor Group and other class members.

Further, the members of the Institutional Investor Group each have the resources and sophistication to fulfill the statutory role of lead plaintiff. The Institutional Investor Group's members have a large and dedicated staff with the legal, financial and organizational expertise to effectively oversee this proceeding and direct the actions of lead counsel. The resources and sophistication at the Institutional Investor Group's disposal will serve the Class well, as those resources will permit the Institutional Investor

17

Group to closely monitor the litigation and prosecute the case in the Class's best interest.

*See* Institutional Investor Group Certifications, Jarvis Decl., at Exs. A-D.

### 3.    The Presence of Foreign Investor Does Not Impact The Institutional Investor Group's Adequacy to Serve As Lead Plaintiff

The fact that one member of the Institutional Investor Group (Union) is a foreign investor in no way affects its ability to adequately represent the Class. This is especially true given that Union's purchases occurred on the NYSE. *See In re NPS Pharm., Inc. Sec. Litig.*, No. 2:06-cv-00570-PGG-PMW (D. Utah Nov. 17, 2006) (rejecting argument that foreign institutional investor that bought shares of a U.S. company on a U.S. exchange may be subject to the unique defenses of subject matter jurisdiction and res judicata) (attached as Jarvis Decl. Ex. E). Courts across the country have frequently appointed foreign investors lead plaintiffs in putative securities class actions. *See, e.g., In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 151 (D. Del. 2005) (observing that a foreign lead plaintiff movant was "correct in its assertion that many courts, including this one, have approved foreign investors as lead plaintiffs in cases such as this" and holding that a group of investors led by a German investment firm was entitled to appointment as lead plaintiff because it had the largest financial interest of any movant, was otherwise adequate and typical, and would not be subject to unique defenses because of its foreign status) (citing cases).[19]

---

[19] Cases in which courts have appointed foreign investors as lead plaintiff in securities class actions include *Keller v. First Marblehead Corp.*, No. 08-10612-JLT (D. Mass. Aug. 28, 2008); *In re Dell Inc., Sec. Litig.*, No. A-06-CA-726-SS (W.D. Tex. Apr. 9, 2007); *Mass. Laborers' Annuity Fund v. Encysive Pharm. Inc.*, No. H-06-3022 (S.D. Tex.

In *In re: The Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *5-6 (N.D. Ohio, May 12, 2004) (Narwold Decl. Ex. F-4B) the court appointed a foreign investor lead plaintiff in a putative securities class action against an American corporation, despite an opposing movant's "attempt to discredit Capital Invest on the ground that it is a non-domestic (Austrian) investment firm." *Goodyear*, 2004 WL 3314943, at *5-6. The court there recognized that many foreign citizens are "entitled by treaty to the same rights and privileges before United States Courts as United States citizens" and observed that "[e]ven in the absence of a treaty, to exclude a foreign investor from lead plaintiff status on nationality grounds would defy the realities and complexities of today's increasingly global economy." *Id.*

---

Mar. 20, 2007); *Welmon v. Chicago Bridge & Iron Co. N.V.*, No. 06-CV-01283 (JES) (S.D.N.Y. May 11, 2006); *In re Able Labs. Sec. Litig.*, No. 05-2681 (JAG) (D.N.J. Mar. 17, 2006); *Mirco Investors, LLC v. Inspire Pharm., Inc.*, No. 1:05CV00118 (M.D.N.C. Mar. 1, 2006); *Kadagian v. Harley-Davidson, Inc.*, No. 05-C-0547 (E.D. Wis. Feb. 14, 2006); *In re General Motors Corp. Sec. Litig.*, No. 05-CV-8088 (RMB) (S.D.N.Y. Feb. 6, 2006); *In re Conagra Foods, Inc. Sec. Litig.*, No. 8:05-cv-00292-LES-TDT (D. Neb. Dec. 2, 2005); *In re Dreamworks Animation SKG, Inc., Sec. Litig.*, No. CV 05-03966 (C.D. Cal. Nov. 7, 2005); *Olsen v. New York Cmty. Bancorp, Inc.*, No. 04-CV-4165 (E.D.N.Y. Aug. 9, 2005); *Cox v. Delphi Corp.*, No. 1:05-CV-2637(NRB) (S.D.N.Y. June 27, 2005); *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA (N.D. Cal. May 24, 2005); *South Ferry LP #2 v. Killinger*, No. CV04-1599 JCC (W.D. Wash. Nov. 30, 2004); *Conway Inv. Club v. Corinthian Colleges, Inc.*, No. 2:04-cv-05025 (C.D. Cal. Nov. 1, 2004); *Curtis v. BEA Sys., Inc.*, No. C04-2275 SI (N.D. Cal. Sept. 24, 2004); *In re: Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *5-6 (N.D. Ohio, May 12, 2004); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (S.D.N.Y. Sept 5, 2003); *In re Williams Sec. Litig.*, No. 02-CV-0072-H(M) (N.D. Okla. July 8, 2002). A compendium of copies of these decisions is attached hereto as Exhibits F1-F6 to the Jarvis Declaration.

19

Union is an institutional investor that is familiar with the provisions governing the appointment of lead plaintiffs in PSRLA actions. Union is a large German asset management company. After due consideration, the General Counsel of Union, after reviewing the merits of this action and the qualifications of its proposed lead counsel, affirmatively decided to seek appointment of Union, with the other movants, as lead plaintiff. Union is fully committed to serving as a fiduciary to the class and to the zealous prosecution of this matter as the lead plaintiff.

### D. The Court Should Approve the Institutional Investor Group's Choice of Counsel.

Pursuant to §21D(a)(3)(B)(v), 15 U.S.C. § 78u-4(a)(3)(B)(v), of the PSLRA, the Institutional Investor Group selected and retained counsel to represent the Class, subject to the Court's approval. This Court should not disturb Lead Plaintiffs' choice of counsel unless it is necessary to protect the interests of the Class. *See In re Cavanaugh*, 306 F.3d 726, 734 (9th Cir. 2002) ("Selecting a lawyer in whom a litigant has confidence is an important client prerogative and we will not lightly infer that Congress meant to take away this prerogative from securities plaintiffs. And, indeed, it did not. While the appointment of counsel is made subject to the approval of the court, the Reform Act clearly leaves the choice of class counsel in the hands of the lead plaintiff"). In that regard, the Institutional Investor Group has selected and retained the law firms of Grant & Eisenhofer and Motley Rice, as Lead Counsel, and Gustafson Gluek as Liaison Counsel for the Class.

Grant & Eisenhofer is among the preeminent securities class action law firms in the country and is currently serving as lead or co-lead counsel in several complex securities fraud cases involving, *inter alia*, Tyco International, Marsh & McLennan, Parmalat, Global Crossing, Pfizer, Alstom, and Refco. Grant & Eisenhofer achieved national recognition in representing institutional investors, particularly public pension funds, in federal securities fraud and related litigation. As lead counsel, the firm has recovered and collected over six billion dollars for shareholders. Grant & Eisenhofer has been lead counsel in some of the largest securities class actions in history, and in the case with the largest recovery in the long history of the Delaware Court of Chancery. *See* Grant & Eisenhofer Firm Resume, Jarvis Decl. at Ex. H. Similarly, Motley Rice has substantial experience in the prosecution of shareholder and securities class actions, and is a highly accomplished securities firm.[20] *See* Motley Rice Securities Resume, Jarvis Decl. at Ex. I.

Grant and Eisenhofer and Motley Rice have associated with Gustafson Gluek PLLC to serve as liaison counsel in this matter. Gustafson Gluek PLLC is an experienced complex litigation and class action firm and has recently served as Liaison Counsel in *In re St. Paul Travelers Securities Litigation I and II* (D. Minn. JRT/RLE). In addition, the firm has served as Lead Counsel in numerous other complex cases in

---

[20]As the district court noted when appointing Motley Rice Co-Lead Counsel in *Marsden v. Select Med. Corp.,* No. 04-4020 (E.D. Pa. Order entered Oct. 5, 2006), "Motley Rice LLC possess[es] the requisite knowledge and skill in securities litigation to ably prosecute this matter on behalf of the class."

antitrust, consumer fraud, and defective medical device matters in this District and around the country. *See* Gustafson Gluek Firm Resume, Jarvis Decl. at Ex. G.

Accordingly, the Court should approve the Institutional Investor Group's selection of Grant & Eisenhofer, Motley Rice, and Gustafson Gluek as lead and liaison counsel for the Class.

## CONCLUSION

For all the aforementioned reasons, the Institutional Investor Group respectfully requests that the Court appoint the Institutional Investor Group to serve as Lead Plaintiffs for the Class; and approve the Institutional Investor Group's selection of counsel for the Class.

Dated: February 9, 2009

Respectfully submitted,

s/ *Daniel C. Hedlund*

Daniel E. Gustafson (No. 202241)
Daniel C. Hedlund (No. 258337)
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN  55402
Tel: (612) 333-8844
Fax: (612) 339-6622

*Liaison Counsel for the Institutional Investor Group and Proposed Liaison Counsel for the Class*

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Geoffrey C. Jarvis
Jeff A. Almeida
485 Lexington Ave 29th Floor
New York, New York 10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501

[signature page continues]

MOTLEY RICE LLC
Joseph F. Rice
Ann K. Ritter
James M. Hughes
P. O. Box 1792 (29465)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel:  (843) 216-9000
Fax:  (843) 216-9450

*Counsel for the Institutional Investor*
*Group and Proposed Lead Counsel for the*
*Class*